Good morning, your honors. All the statutes of the state's attorney on behalf of the people of Illinois. You want to reserve some time for rebuttal? Yes, I will reserve five minutes for rebuttal. Thank you. May it please the court. Again, my name is Diane O'Connell and I represent the petitioner and appellant David Ayala. Mr. Ayala's post-conviction petition puts forth a wealth of evidence of his actual innocence. It shows that the state's entire case against him was false, that he was framed through coercion and manipulation of teenagers who had no knowledge of the events, suppressed eyewitness identification of people who did, and concealed exculpatory statements. He is entitled to a new trial or, at a minimum, an evidentiary hearing on his claims. Mr. Ayala has already served 40 years of a mandatory life without parole sentence for something he didn't do when he was 18. Mr. Soto's attorney has explained John DeLeon's conflict of interest in detail, and I would like to first make it clear that Mr. DeLeon represented Mr. Ayala as well. Then I would like to turn to the evidence of actual innocence, but I'm happy to take questions on the other issues. I have this notion that Mr. Adam and Mr. DeLeon, did they file appearances for your – both file appearances for your claim? Actually, they filed one appearance form with both the defendant's names on it and both of their names on it, not just in the signature line, but also in the body of the appearance form, and it does not distinguish between which one was representing which defendant. And yet you're arguing they were representing both of them. Yes. And was there ever any motion to sever these two individuals? They were tried in front of the same jury, weren't they? Correct, yes. So all of them was that? Correct. So there was never a motion to sever? Correct. Okay. Yes. And if we look at – So there wasn't really a conflict in their defense positions at all, was there? No. They were – it was a joint defense. Right. Completely cohesive. Okay. So – so – all right. So doesn't that contradict kind of what you're saying about this – that they were representing both of them? Weren't they each representing one, but they had a coordinated defense in the case? No. It was joint representation, and the way we know that is first by looking – Does that pose a problem? Is it – can you lead us into what that does for your position? Well, what it does for our position is it means that if this panel finds that Mr. De Leon had an actual conflict with regard to his simultaneous representation of Victor Rodriguez or a per se conflict with regard to that representation, then that also extends to Mr. Ayala because John De Leon was, in fact, Mr. Ayala's attorney. You mean it would be imputed to Mr. Ayala's counsel? Wasn't that Sam Adams? That is also an alternative argument that we make. Well, who represented him at the jury trial? Who stood up before that jury, argued the case for your client? So I will admit that when the trial began, there appears to have been an operational division of duties with regard to who did the cross-examination and the direct examination on behalf of which defendant. And so in that sense, if you read just the trial transcript, it corresponded to Adam on behalf of Ayala and De Leon on behalf of Soto. However, if you look – I'm sorry, were you about to say something? I mean, if you look at the transcript, you'll see that Mr. Adam represented Ayala. So I would just like to say that even if you look up until the very last motions that were filed before the trial started, okay, there was 11 pretrial motions. They're almost all filed on behalf of both defendants with both attorneys' names, again, appearing in the body of the motion and, again, on the signature line. But the last motion, one of the very last motions filed right before trial, is a motion to quash the search warrant on Mr. Ayala's home. And it's filed just on behalf of Mr. Ayala. And it still has both attorneys' names on it. It states that it states, now comes David Ayala by his attorneys Sam, Adam, and John De Leon. So let's – I mean, in addition to the report of proceedings where we have at least seven times on the record these attorneys saying – one of the attorneys saying that they represent both defendants, and that includes John De Leon saying explicitly that he represents Mr. Ayala, we also have every document filed in this case until the actual trial. So I do think we should believe what the written documents say. And in addition, we have the statement of Mr. Ayala saying that when he was arrested at the police station, he called Mr. De Leon because that was his attorney. And then during trial, we have a witness spontaneously saying that she went to Mr. De Leon with information she had about the case because he was Mr. Ayala's attorney. So there's ample oral and written evidence to say that there was joint representation here. Well, they worked out of the same office, didn't they? Well, they did, and thank you for asking that. So that – I mean, that goes toward the imputed piece. I would respond they did not just work in the same office. They were not just business partners. I mean, if there was ever a situation where a conflict would be imputed, it would be to these two men who were literally working on the same case at the same time in the same room. And even during his closing argument, Sam Adam is referring to Mr. De Leon as his partner. And again, they were sharing their entire defense strategy. So unless – Was there a case that would say that if there's a conflict between one lawyer and his client, that that would be imputed? Well, the Illinois Rules of – Or somebody else? Well, the Illinois Rules of Professional Conduct are very clear on that point. Pardon? The Illinois Rules of Professional Conduct say that very explicitly, Rule 1.10a. Well, I'm just asking if you have a citation of a case that would say that it's implied through another – I don't know of any case that says that. I have not found any. Thank you. Go ahead. And next, I would like to turn to the evidence of actual innocence. Mr. Ayala has presented substantial newly discovered evidence of actual innocence in this case. And the post-conviction judge erred when he engaged in premature fact-finding and credibility determinations and also made some really fundamental misstatements of the facts in the case that I think show that he did not really understand what happened at trial. He said that Mr. Ayala lived close to the park. Mr. Ayala lived 11 miles from the park. He stated that Lisa Suarez testified at trial. Lisa Suarez didn't testify at trial. He misstated the sequence of events. He misstated the weapons that were allegedly given to the shooters right before the crime. So I don't want to go too much into the weeds on that, but I would invite us to take a new look at how this new evidence is newly discovered and non-cumulative. So it is newly discovered because we have witness recantations. A statement from one declarant who took the fifth. Is that plural? Yes, two. Okay. Who are they? So thank you for asking that. I think the two most important, and I think we can honestly just look at these two and say that this by itself warrants a hearing, and that's Juan Padilla's statement and Isabel Gomez's statement. So Juan Padilla is the surviving victim in this case. And although we should not engage in credibility determinations, his affidavit that he saw the shooters at the time and that he told the police who the real shooters were is credible because it is corroborated on the record by the CPD officer who testified at the grand jury that the victim told him who the shooters were. So Mr. Padilla states, I told the police, then I told the prosecutors. The prosecutors told me not to say that. They offered to terminate my parole early if I would implicate Ayala and Soto. Then they offered to violate my parole if I refused to implicate Ayala and Soto. So Mr. Padilla explains that because he refused to implicate people who didn't do it, he just said at trial that he didn't see them at all. Now, this evidence, I believe, absolutely would have changed the result because the jury only heard, it didn't hear any alternative theory as to who the shooters were in terms of an eyewitness except for what Wally Cruz said. The surviving victim saying, yeah, I saw the person who shot me, would have been very persuasive evidence that the jury did not hear. And then when you look at Isabel Gomez, who is also recanting by saying, I lied at trial about the phone call, the phone call that supposedly tied who was in the park to Mr. Ayala's knowledge about who was in the park in order that he would have been able to tell someone to go commit this crime. Actually, that phone call never happened. And the reason that I lied about it was because I was intensely coached by prosecutors. I was under indictment. I was scared. I had been harassed by the police previous. So I think this evidence of these two witnesses, which would have removed the phone call, would have provided another story about who the shooters were and would have corroborated each other on this misconduct about the dishonesty that these two people were pressured into, would have suggested. So what does the FDSA say in this application? He states that he heard the shots and he saw J.J. Rojas firing the gun. And then he says that he ran down the alley and someone told him Victor Rodriguez was the other shooter. But he says he saw J.J. Rojas firing at him. And Cruz testified at trial, didn't he, that Rojas, he saw Rojas and Victor? Yes, he testified that he saw them in their van and he stopped to talk to them. Right, but they were essentially in the same alley area, weren't they? I don't remember that level of specificity. I think that he said he saw them nearby and he talked to them briefly. So Cruz, who testified at trial, also corroborated the fact that Rojas was at least in the area. And the jury heard that, right? That's not the same thing as the victim saying, I saw the person shooting at me. No, I'm not saying this. Okay. And that's not what I put to you. Sorry for, I didn't want to evade. Yes, I believe that that's accurate to say that Cruz also said they were in the park or near the park. So then, of course, you know, we already had the other two witnesses about the identity of the real shooters. And then, of course, we have four other people saying that they were coerced, in some cases, through the use of physical violence into implicating these two. Is all the stuff about the gangs kind of like fake? Was this really not something that had to do with any kind of gangs? Or not? Like, isn't this about, wasn't the theme here that the Two Sixers were at war with the Latin Kings? Was that all made up, too? Or were most of these people all involved in that culture themselves? So the evidence at trial did not really hash out whether or not there was a war. It just said. Oh, I'm sorry. Forget about a war. Let's just talk about the Two Sixers and the Latin Kings. Forget about a war. I'm sorry. So the question was, is it not true that these people were gang members? Yeah. Is there something that we should also be aware of that that was kind of like all fake? There aren't really gangs. There wasn't anything that had to do with the Two Sixers or the Latin Kings. That was all kind of made up. I don't think it really matters whether it was made up. The prosecution, you know, tried to say they needed to introduce the gang evidence as motive, as a motive. But that's not the only thing that it was used for. And so to the extent that it prejudiced our client because he was perceived as being guilty because of his status as a person who was either a member of or in some way involved with the Two Six, that affected the fairness of the trial to the extent that it was also used to discredit the defense witnesses. We had people here who were testifying as to an alibi, credible alibi. Well, again, is the alibi that they were at the home of Mr. Inao? Is that the alibi? Yes, that's correct. And how many people are basically saying that, that they were actually, they didn't leave Iao's home? Three. Three, okay. And none of them were called originally. No, there were. There were two. There were two. Right. Two of the three had already said that Iao was home and nowhere to be found and had nothing to do with this. Isn't that right? That is right. And I maintain you really do not need to get to the alibi evidence at all. No, I understand. But it's been used, isn't it, for both of the actual innocence claims that are before us in this case and so does, isn't that part of this whole actual innocence claim? I think it is, but I would say of all the evidence that we have. And you've talked about them, that there's new alibi witnesses when, in fact, there really aren't. Oh, I don't believe I did identify them as new. There is one. There is one. Okay, one. But I think what's more important really than even all the people, because very related to the alibi evidence is you've already mentioned this, is the evidence about whether the gang meeting occurred. Right. And I understand the argument that that's cumulative. And how many of the witnesses at the original trial said there was no gang meeting? So depending on how you slice it, four. Two people said. The jury heard that there was no meeting from four separate people. Depending on how you slice it. There are some very specific things to be said about those testimonies, but I think even more importantly than that, to say that this new evidence, these affidavits that also include there was no gang meeting, to say that those are only about whether or not there was a gang meeting is to construe them too narrowly. Because that's not all they say. They also say I was held for three days incommunicado, not fed, put in front of a grand jury. And that's what is the argument as to why this is newly discovered. That absolutely explains why it's new and it also. And why it wouldn't be cumulative as well. Absolutely. And that's what I was getting at. All right. Absolutely. Thank you. I will concede unless anyone has any other questions. Thank you. Thank you. May it please the court. Excuse me. Counsel. Well, let's start with the facts here. Padilla, the victim, who was shot in the backside, literally, told the police and hospital he didn't see who shot him. How could he? Got shot in the rear end. At trial, he testified, I didn't see who shot me. How could he? He got shot from behind. And I guarantee you after getting shot, he didn't just start dancing around. Be that as it may. And all of a sudden we have an affidavit from him that seems to suggest that he knows who shot him. And who does he say? Rojas. Well, what do you say about Rojas? I would say that he was able to see Rojas after originally telling the police and at the hospital and the medical evidence established that he was actually shot in the backside. Does he give us anything more in the affidavit that now he could see the person even though he heads back to the person who shot him? He did not explain where this came from. I think where it came from is he had earlier a lot of witnesses that testified that they saw Rojas in an animal control van driving through the park. But again, we're not making credibility determinations. No, we're not. But the point is that what is claimed now are affirmatively rebutted by evidence in the record. And they don't need to be taken as true. So that takes pure opinion. Gomez testified at trial. She testified to the situation that occurred with police harassing her and being charged with obstruction. She also testified that Suarez made a call. She just didn't know to whom it was. She couldn't confirm or say it would have been hearsay. That was all kept out. But she did confirm that there was a call made. And didn't each of those witnesses actually testify at the trial that they were charged with obstruction? The Hodge brothers didn't testify. Okay, but she did and wasn't there another person? I believe Suarez did. Okay. I mean, I thought there was a break in the trial so that the defense counsel could examine these witnesses because they were now saying that they were charged with obstruction. Maybe I'm wrong. No, you're not wrong. There, in fact, was a continuance granted. Mr. DeLeon and Mr. Adams, I believe Mr. Adams went and pulled the file. They reviewed the file. They then finished the cross-examination of Ms. Gomez. And then in their case in chief, they called a clerk of court to come and introduce the file from the obstruction case into evidence. And then they argued about it to the jury in closing. So let's talk about the problems with the actual innocent evidence, actual innocence evidence. It's not newly discovered. All these witnesses were known to the defense, to the defendant, well before trial. So if they had anything to say about how they were treated or mistreated or anything else, that could have been discovered and brought out then. And their testimony is cumulative because the theory here is that what establishes Ayala's innocence is that no meeting took place. In fact, that's the theory that Soto's going on, that no meeting took place. So you had seven witnesses come in and testify that no meeting took place. So what these affidavits say is I would have come in and testified that no meeting took place except this other bad stuff that went on. I was harassed or pressured or that kind of thing. So even if you take the affidavit, they're still cumulative because what they would have come in and testified to is that no meeting occurred. That's cumulative. The jury heard all about that. The jury heard about so-called police misconduct, prosecutorial excessiveness, whatever. And the jury came back and found what it found, and what it found is that defendants were both guilty of murder and attempted murder and conspiracy. So the evidence is not newly discovered. It's not – and, again, it's not conclusive – you know, it's not of such a conclusive character. But isn't that really going into the credibility? Isn't that what the Robinson case was kind of really all about, that if you – I mean, there's really no way around it, even though that the standard was always that the evidence had to be so conclusive. And yet at the same time, you're not supposed to be making credibility determinations at the first or second stage. So how could you ever really – how could a judge ever really say something is not so conclusive if they're not allowed to make any credibility determinations? Now, I understand the shot-in-the-back thing. I understand that. There was a case, Sanders – maybe it was Edwards – where the Supreme Court said that this was definitely a contradiction, absolutely rebutted by the record, that you may have an argument as far as that. But these other witnesses, aren't you making credibility determinations? No. You're just looking at the substance of their testimony and what it goes to and doesn't go to, even if you accept – All right. So you're arguing – If you accept it's true that there was – That there was no meeting, that there was no meeting, that I wasn't there, that that's not so conclusive. I mean, I think you can make that argument. The judge made that finding. Right. He said that this is not so conclusive that it would change the outcome of the trial. So two things. One, to take their affidavit as true, that means that they would come in and say what they said in the affidavit, that there was no meeting. Okay? Not that the jury would have bought it. That's not what taking something as true means. It means they would have come in and testified as laid out in the affidavit. The jury heard all that. The jury heard from seven witnesses. Okay? No one ever said Illa was on scene. That wasn't the point. He was the mastermind. He gave the order. He was the leader. Was this a gang-related shooting? That's what the appellate court found, this court found previously, that this was a gang meeting. They sat around talking about making hits on kings. Trial court, cert court didn't get that wrong in its order. That's exactly what this court previously held that the evidence showed. But, you know, before we get to the substance of a lot of this, we also have to ask the question of whether, well, I guess not on the actual innocence claim, I stand corrected, the delay, the fact that Mr. Illa waited 28 years to take action. It knocks out all of his other claims, all the other things he's trying to raise. And, you know, even though he wasn't required to show cause and prejudice as Mr. Soto and contrary to the representation the state made in prior argument, there was no concession that there was cause and prejudice on the actual conflict of interest claim. That's just not what occurred below. But be that as it may, so the Brady claim, unlike counsel or unlike Mr. Soto, Mr. Illa doesn't acknowledge that the claim being foisted on appeal is entirely different than the one raised below, and that just is the fact. The claim below was limited to the four witnesses who were the subject of the obstruction charges, Suarez, the Hodge brothers, and Gomez, and that's it, and that's not what they're trying to portray it as now on appeal. And then one of the claims that Mr. Illa raises that's not raised by Mr. Soto is his claim of trial court ineffectiveness or trial counsel ineffectiveness at trial and then related claim of appellate counsel not raising these issues. One, that claim obviously is a time bar not being brought anywhere near within the limitations period. That's applicable. The other thing, too, on the merits they lack, they lack substance. One, the issue about jury instructions on accomplice witness. That's been ruled upon by this Court in the context of a prior appeal by Mr. Soto, and I think that rationale would carry through here that the substance of that instruction was adequately covered by the other instructions given. Whether there should have been questioning on gang bias, that didn't become a concept, a rule, a proposition in the law until 2000, 18 years after trial. So I think we can hardly fault trial counsel or appellate counsel for not zeroing in on that issue. Plus, it would have been futile in this case where, as the record shows and this Court has already found, this case grew out of gang animosity. And so I think that that – oh, and then the other question that is raised in the context of ineffectiveness is about whether or not to have called certain witnesses, and that kind of ties back in with the actual innocence and all that kind of stuff. And it's the same situation where you had a – first of all, it's a trial strategy decision. You had a very defined strategy that the defense embarked on. And what was that? It was Wally Cruz is a liar, don't tell me about gangs, that's irrelevant, none of this. All of this stuff the State's throwing at you has nothing to do with anything. This case turns on one question and one question alone. Do you believe a word that comes out of Wally Cruz's mouth? And the defense counsel, Mr. Adams, spent considerable time, and Mr. DeLone as well, attempting to destroy the credibility of Mr. Cruz. Counsel here didn't really pursue the actual – or the per se conflict of interest claim. I think it's vehemently in oral argument, at least as prior counsel. But, again, the issue really is decided, I think, by Morales. 209 Illinois 2nd at 346. In Morales, Hernandez was a potential witness, and his out-of-court statements about the defendant in the letter were admitted into evidence at sentencing. However – and I'm quoting from the case, obviously – However, the fact remains that he was never a witness. Thus, defense counsel never assumed the status of attorney for a prosecution witness. We therefore hold that attorney defense counsel's simultaneous representation of Hernandez and defendant did not constitute a per se conflict of interest. But in that case, wasn't that State witness was on a totally unrelated case? Isn't that really what distinguishes this? This case for Morales, we're not talking about a witness on an unrelated case. We're talking about a witness on a related case. Right? Wasn't Victor charged as a juvenile? And then eventually the charges were dismissed. That's true. And then he was listed as a witness on the State's list of discovery. He was actually withdrawn. But, I mean, Morales, the witness, was on an unrelated charge. I mean, that's what it says. And that has nothing to do with the ultimate holding in Morales. The reason that the Court found no per se conflict of interest is because the fact remains that Hernandez was never a witness. Thus, defense counsel never assumed the status of attorney for prosecution witness. But wasn't there also a waiver in Morales? Didn't the defendant know about the conflict and waived it? I don't believe there was a waiver. Okay. Well, I think that's in the case. I could be wrong. I may have been wrong. It's more likely that I'm wrong. But that's not what figured in. That's not what the decision turned out to be. Okay. The Court made the point, we therefore hold. Because he never assumed status, we therefore hold. So, again, the per se rule is to be applied very, very narrowly. It is a radical rule. We don't apply this loosely. It's very tight. Now, what does that mean? Does that mean the defendant is out of luck? No. That's where the actual defense still may seek release if you can show an actual conflict of interest. So, you know, again, the per se rule, yeah, it's a radical rule. And it produces a radical remedy. Boom, automatic retrial. That's not appropriate here because de Leon, and certainly not Adams, never assumed the role of counsel for a state witness. Well, so then I think that's what Ms. O'Connell is actually advocating, that we should impute that Sam Adams was conflicted because de Leon represented someone else on another case. I mean, maybe if they had joint representation, but I don't know where we get, how do we get to even impute this. Okay. Well, it doesn't, whether you impute it or not makes no difference on the per se side. No, I know. You've already outlined why you do not believe the per se conflict. So, and then on the actual side, I think the court's observation is correct. All we know is that they were suite mates or, you know, not even office mates, but shared a suite of offices. We had the offices of John de Leon, the law offices of Sam Adams. They did coordinate, right, work on a joint defense, a joint defense approach. And at trial, de Leon represented Soto and Ayala represented, and Adam represented Ayala. There is nothing to suggest that they are, in fact, business partners. In fact, the evidence that's been tendered shows they are distinct legal operations, legal businesses. So you don't have the situation where you have a partner in a law firm responsible for every other partner or associates or that kind. You don't have the basis to impute these things. Rather, you would have to show that, in fact, they were jointly representing him or representing both defendants. And while colloquially, I suppose, is one way of putting it, somebody, de Leon would show up for a hearing and say, Mr. Adams is running late, so I'll appear on both defendants. Or Adam would appear on behalf of the defendants when de Leon was in another courtroom for purpose of a status or something like that. When it got down to it, when it got down to trial, to selecting a jury, to openings, witness, exam, cross-exam, closings, they were distinct and independent in terms of their, the manner in which they represented each client. They were not speaking in unison. They were not one or acting as one and representing both. So I don't think we get to the imputation part, and I think that knocks out Ayala's claim. And because Soto didn't raise the claim, but tried to orally adopt it after the stated file, its motion to dismiss and everything else, he's out of the box, of course, on that ground. Well, in sum, then, I would just ask that the court affirm the dismissal of Mr. Ayala's petition on the grounds, the ample grounds I think laid out in our brief, and also affirm the denial of the motion for leave to file a successive petition raising a proportionate penalties challenge under Dorsey and the other grounds outlined in our brief. Thank you. Yes, thank you. So counsel just raised several arguments that I spent quite a significant portion of my time addressing, I think without really responding to the specific arguments I made, for example, about the joint representation being evident, not just a couple status hearings, but in much more significant ways, and also about the cumulative nature of the evidence, which I think I adequately addressed. So I just want to take a moment to just correct a couple things, and also clarify what sounded like a concern for one member of this panel, which was this statement that Juan Padilla wouldn't have been able to see the shooter, and that that's affirmatively rebutted by the trial record. His affidavit very clearly says he saw John Rojas firing a gun before he turned around. I mean, he doesn't say before he turned around, but he says in that sequence, I saw him firing a gun, and then I was shot in the back. So I don't think that, you know, you're not going to get every detail from a written statement, certainly that's a fact question for a hearing, but I do not think it's affirmatively rebutted by the record, especially where we have this explanation about how this false testimony kind of came around and other things. And then two, opposing counsel stated that at trial Ms. Gomez said she didn't know who Lisa Suarez called from the home run-in. That is not true. She actually stated during her testimony that Ms. Suarez called Mr. Ayala. It's true the judge did tell the jury to disregard that, but the cat was out of the bag at that point. And just briefly on the gang bias argument that was raised, which is that at the time of this trial, that can't be considered ineffectiveness not to have ordeered the jury on it. We can see on the record that when the gang evidence is first raised during the testimony of the first witness, Sam Adam has a sidebar where he says to the judge basically like, oh, no, the jury wasn't ordeered on this, and actually realizes his very large error. So I think just based on that, we can see that this was an issue at the time that counsel was aware of, and he actually acknowledged his mistake. And this could never have been raised on direct appeal, even though it's on the record? I think it should have been raised on direct appeal, and it was ineffective not to. It's a glaring problem. So there's no place along the way where this could have been raised? You're saying that the first time it's coming up is in this most recent petition? Well, he only has one post-conviction. Yeah, is it 2015? Filed in what year? 2015. Right. That's correct. And also just to respond briefly to the suggestion that he should have filed that PC sooner, there is no law that says, you know, due diligence in terms of filing a post-conviction when you're claiming actual innocence has to be any sooner. I mean, the law is very clear that the due diligence standard only applies to trial. So I just think that's a red herring. And in closing, Mr. Ayala is asking this panel for a fair trial or a hearing to present his compelling evidence of actual innocence. Thank you very much. Thank you, guys, for good arguments and good briefs, and you gave us an interesting case, and we'll have a decision for you shortly, and the court will be adjourned.